IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
|  | : |
|  | : CRIMINAL ACTION NO. |
| v. | : 1:13-CR-128-AT-JSA |
|  | : |
| ARTURO ROJAS-COYOTL | : |
|  | : |
|  | : |
|  | : |

## ORDER AND REPORT AND RECOMMENDATION

The Superseding Indictment charges Defendant Rojas-Coyotl ("Defendant") and certain Co-Defendants with several counts of sex trafficking, in violation of 18 U.S.C. § 1591, and encouraging and inducing illegal entry and residence by an alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).   The Defendant has filed two Motions to Suppress, which are the principal subjects of this Report and Recommendation.

First, Defendant has filed a Motion to Suppress [59] the fruits of certain searches that the Federal Bureau of Investigation ("FBI") conducted of his residences and other premises.  Although these searches were authorized by warrants, Defendant argues that the warrant applications were not supported by probable cause and should have been denied.  This Motion required no additional

evidence and was argued on the briefs submitted by the parties. [59] [69] [76].

Second, Defendant has filed a Motion to Suppress Identification Evidence [90], which argues that the FBI used unduly suggestive procedures to obtain unreliable out-of-court identifications of him by three alleged victims.  As to this motion, the Court convened an evidentiary hearing on October 8, 2013 [107].  The parties submitted post-hearing briefs [112][116][117].

The Court **RECOMMENDS** that Defendant's Motions to Suppress [59][90] both be **DENIED**.  Defendant's argument for suppression of the fruits of the search warrants fail because the applications established probable cause for the proposed searches, and in any event were not so wholly void of probable cause as to deprive the agents of a reasonable belief in the validity of the warrants. Defendant's arguments for suppressing the alleged victims' identification testimony fails as well.  The identification procedures were not unduly suggestive and in any event the evidence shows that the witnesses were well acquainted with Defendant and that their identifications were therefore reliable.

# I.     MOTION TO SUPPRESS SEARCH WARRANT PROCEEDS [59]

## A.     THE FACTS SET OUT IN THE WARRANT APPLICATIONS

On May 17, 2013, U.S. Magistrate Judge Linda T. Walker issued a Warrant authorizing searches of several premises, including 601 Club Parkway, Norcross, Georgia ("Club Parkway"), and two apartment units in the Forest Vale Apartment complex, 6205A Forest Vale Drive, Norcross, Georgia ("Forest Vale 3" and "Forest Vale 5").  Warrant [76-1] at 1-3.  Magistrate Judge Walker issued the Warrant based on the Application of FBI Special Agent Jennifer Towns, also dated May 17, 2013.  Affidavit [76-1] at 8.  The Application established, in sum, the following:

### 1.     Conduct Between 2006 and 2008

Agent Towns interviewed a young Mexican woman identified as FBF. Affidavit [76-1] ¶ 12.  FBF stated that she met Defendant Rojas-Coyotl in Mexico around February 2006, and that he convinced FBF to enter the United States with him earlier that year.  *Id.* ¶ 12.B.  Once in the United States, according to FBF, Defendant Rojas-Coyotl "used threats, intimidation, and violence to compel FBF to engage in prostitution," and "took the prostitution proceeds from her."  *Id.* ¶ 12.D. FBF reported that Defendant Rojas-Coyotl also used other women who worked for

him and Co-Defendant Martinez-Rojas as prostitutes. *Id.* At one point in 2008, Defendant Rojas-Coyotl told FBF that a Guatemalan girl (identified in the affidavit as MSJ) would be coming to live with him. *Id.* ¶ 12.E. FBF subsequently escaped. *Id.*

Agent Towns also interviewed MSJ and another Guatemalan woman identified as SAM. *Id.* ¶ 13. They explained that, in 2007, they were induced to enter the United States by individuals later showed to be Defendants Rojas-Coyotl and Martinez-Rojas, who had both pursued them romantically over the telephone. *Id.* ¶ 13.A. The Defendants paid the smuggling fees for the girls, picked them up once they reached the United States, and drove them to an apartment in the Atlanta, Georgia area. *Id.* The girls had been promised legitimate work. *Id.* ¶ 13.B. But after they arrived in the United States, Defendant Martinez-Rojas forced SAM to engage in prostitution, and Defendant Rojas-Coyotl assaulted MSJ and "used intimidation, threats and violence" to compel her to also engage in prostitution. *Id.* ¶¶ 13.B-C. Defendant Rojas-Coyotl took the prostitution proceeds from MSJ. *Id.*

### 2.     Conduct in 2010

Defendant Daniel Garcia-Tepal was apprehended crossing into the U.S. from Mexico in February 2010 with two Mexican women, identified as MRM and WITNESS-1.  *Id.* ¶ 14.  The women apparently subsequently succeeded in entering the United States, as agents encountered MRM, who was 16 at the time, in November 2010 at a "brothel" in Alabama.  *Id.* ¶ 15.

MRM stated that she crossed the border with a woman known as "Chui," whom the agents believe to have been WITNESS-1.  *Id.* ¶ 15.A.  After crossing the border, MRM lived in Atlanta and engaged in prostitution there and in Alabama.  *Id.*  Toll records from her cellular telephone in 2010 show that she was in communications with telephone numbers associated with both Defendants Garcia-Tepal and Rojas-Coyotl.  *Id.* ¶ 16.

### 3.     Specific Facts Relating To The Club Parkway Premises

The Affidavit concludes, based on the following facts, that as of May 17, 2013, Defendants Rojas-Coyotl and Garcia-Tepal resided at the Club Parkway premises, along with MRM and WITNESS-1.  *Id.* ¶ 17.

Between February 11 and April 18, 2013, FBI agents conducted surveillance

of this premises and regularly saw Defendant Rojas-Coyotl enter the building, occasionally with a woman believed to be WITNESS-1.  *Id.* ¶ 19.  The utilities for the premises were in Defendant Rojas-Coyotl's name, a vehicle registered to Defendant Rojas-Coyotl (a 2001 white Chevrolet Lumina) was regularly seen at the premises, and vehicle insurance records associated that address as Defendant Rojas-Coyotl.  *Id.* ¶¶ 18, 20.  On a particular date in April 2013, FBI agents saw Defendant Rojas-Coyotl and an unidentified female and young child leave the Chevrolet Lumina and enter the Club Parkway premises.  *Id.* ¶ 21.

On various dates between November 2012 and April 2013, agents saw Co-Defendant Garcia-Tepal enter the Club Parkway premises.  *Id.* ¶ 22.  During this time period, agents regularly saw a 2000 Toyota Celica parked near the premises. *Id.* ¶ 23.  This car was registered under another's name but according to insurance records, MRM's name along with "David Garcia" (a known alias of Co-Defendant Garcia-Tepal) were added as drivers of the car in March 2012.  *Id.*  Co-Defendant Garcia-Tepal was seen driving the car.  *Id.*  On March 12, 2013, agents saw the Celica leave the Club Parkway premises and drive to a local park, at which time the agents saw Co-Defendant Garcia-Tepal and MRM leave the car.  *Id.*

In November 2012, a confidential source ("CS-1"), who has "provided reliable information in the past that was independently corroborated" but who has

"received significant public benefit parole as a result of assisting the government," provided information about a Hispanic female known as "Roxanna." *Id.* ¶ 25. According to CS-1, "Roxanna" works as a prostitute for an unknown man who drives a blue Toyota Celica. CS-1 identified a photograph of MRM as "Roxanna." *Id.* ¶ 25.

According to CS-1, an individual picked up "Roxanna"/MRM from the Club Parkway premises in February 2013 to work as a prostitute. *Id.* ¶ 26. CS-1 provided Roxanna's telephone number, and this particular number is associated with the subscriber "David Garcia." *Id.* Money transfer records show that Co-Defendant Garcia-Tepal and MRM have used this telephone number to transfer money to Mexico. *Id.*

In November 2012, CS-1 provided information about a Hispanic woman known as "Mariana," who also lived at the Club Parkway premises and who engaged in prostitution. *Id.* ¶ 27. According to the Affidavit, "further investigation revealed that Mariana is WITNESS-1." *Id.* According to CS-1, an individual picked up "Mariana" for prostitution from the Club Parkway premises once in November 2012 and twice in February 2013. *Id.* In February 2013, CS-1 provided "Mariana"'s telephone number, and the subscriber was WITNESS-1. *Id.*

### 4.     Specific Facts Relating To The Forest Vale 3 Premises

Utility records show that Defendant Rojas-Coyotl also maintained the Forest Vale 3 premises, as of April 22, 2013. *Id.* ¶ 29. Agents saw the Defendant at that location on various occasions between February and April 2013, and saw the Defendant's white Chevrolet Lumina parked there regularly. *Id.* ¶ 30. On April 19, 2013 at 8:38 p.m., agents saw an individual believed to be Co-Defendant Garcia-Tepal leave the Club Parkway premises in the blue Toyota Celica described above, drive to the Forest Vale apartment building, and then enter the apartment later determined to be No. 3. *Id.* ¶ 31. The agents also saw Defendant Rojas-Coyotl's car parked near the blue Celica. At 9:13, the agents saw both cars leave Forest Vale. *Id.* Less than thirty minutes later the agents saw both cars parked near the Club Parkway premises. *Id.*

### 5.     Specific Facts Relating To The Forest Vale 5 Premises

As of March 19, 2013, utility accounts for the Forest Vale 5 premises were in the name of an unidentified woman with a particular telephone number. *Id.* ¶ 35. This phone number was in communication with a telephone number associated with Defendant Rojas-Coyotl 24 times from March 29 through May 13, 2013. *Id.*

On various occasions between February 11, 2013 and March 26, 2013,

agents saw Defendant Rojas-Coyotl arrive at the Forest Vale apartment complex and enter an apartment on the second floor later identified as No. 5. *Id.* ¶¶ 36-40. On at least one of these occasions he used a key to enter the apartment. *Id.* On several of these occasions he returned to the Club Parkway premises after leaving Forest Vale 5. *Id.* On one of the occasions he left Forest Vale 5 after having been there only for five minutes. *Id.*

### 6. Other Relevant Background

Agent Towns stated that, based on her training and experience, "traffickers often maintain multiple apartments where they keep different woman [sic] who work for them as prostitutes to prevent the women from learning about each other." *Id.* ¶ 41. Agent Towns also explained that "traffickers often maintain and conceal evidence, fruits, and instrumentalities of their crimes at locations other than their residences to prevent them from being discovered by law enforcement." *Id.* ¶ 42. Additionally, "[i]t is routine for traffickers to hide the proceeds of their illegal activity in secure locations within their homes, apartments, businesses, storage facilities and vehicles," and these records "are commonly maintained and concealed in these locations and for an extended period of time." *Id.* ¶ 11.F. Agent Towns further stated "[b]ecause traffickers often change the location of their operations, their residences become a central location to maintain documents and

evidence associated with the operation." *Id.* ¶ 11.L

## B.    ANALYSIS

This case does not involve a warrantless search by law enforcement or an allegation that law enforcement agents exceeded the bounds of a search warrant. Here, the law enforcement agents properly refrained from any search until they presented all material information to a Magistrate Judge and received a warrant authorizing the proposed search.  And the agents apparently complied with that warrant (or at least there is no allegation otherwise).

Rather, the Defendant challenges whether the Magistrate Judge should have issued the warrant at all based on the information presented in the agent's affidavit. This argument faces difficult legal standards, which the Defendant cannot meet. His motion should be denied.

### 1.    Legal Standards Regarding Review Of Sufficiency Of Warrant Applications

A Magistrate Judge asked to issue a search warrant must make a practical common sense decision, given all the facts set out in the application, that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213 (1983).  Courts reviewing the sufficiency

of warrant applications after-the-fact should not do so in a hyper-technical manner; Rather, courts must employ a realistic and common-sense approach so as to encourage recourse to the warrant process and to recognize the significant deference afforded to the decisions of the issuing magistrate judge.  *Id.*; *United States v. Miller*, 24 F.3d 1357 (1994).  Ultimately, the question is "whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).

Moreover, regardless of whether it agrees that the affidavit established probable cause, the reviewing court  must deny suppression unless the affidavit was so lacking so as to render official belief in the validity of the warrant entirely unreasonable.  *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002).  This is because the purpose behind the exclusionary rule–to deter law enforcement officers from violating the Constitution–is not met where an officer's reliance on a search warrant issued by a neutral magistrate judge was objectively reasonable.  *See United States v. Leon*, 468 U.S. 897, 926 (1984).

The undersigned will discuss in the pages that follow the evidence as to each of the relevant premises individually.  As discussed below, the Defendant fails to meet the onerous burden he faces to establish suppression.

## 2.   Application Of These Standards To The Warrants At Issue

### a.   *The Club Parkway Premises*

The Defendant principally argues that the facts presented in the warrant application were too stale.  The staleness doctrine "requires that the information supporting the government's application for a warrant must show probable cause exists at the time the warrant issues."  *United States v. Bemka Corp.*, 368 Fed.Appx. 941 (11th Cir 2010).  In other words, just because criminal activity occurred and evidence might have been found at a location in the past, does not mean that evidence would likely be found at the time of the warrant.

"There is 'no mathematical measure for when freshness fades away and staleness sets in."  *United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011). Nevertheless the Eleventh Circuit has offered several non-exclusive factors to consider in making this case-by-case assessment, including "the (1) maturity of the information; (2) nature of the suspected crime, (3) habits of the accused, and (4) character of the items sought, and nature and functions of the premises to be searched."  *United States v. Harris*, 20 F.3d 445, 450 (11th 1994).

Here, Defendant argues that the information supporting the warrants was stale, because "the application for the search warrants allege conduct that occurred

between 2006 and 2008." Def. Reply [76] at 6. In other words, according to the Defendant, the evidence of his involvement in sex trafficking was limited to the 2006 through 2008 period, and none of the facts discussed from 2010-2013 adequately established criminal activity or the likelihood of finding evidence of such.

Defendant's argument fails. To be sure, Agent Towns's affidavit established based on statements from two separate alleged prostitute victims that the Defendant was involved in sex trafficking and forced prostitution of MSJ, SAM and FBF, during 2006-2008. But while this historical information is relevant to the probable cause analysis, it was not the only information presented in the warrant application. Rather, the affidavit as a whole, read with deference to Magistrate Judge Walker's determination of probable cause, establishes that the Defendant has been engaged in repeated and extended acts of sex trafficking, involving multiple young women, for several years. And several specific facts suggested that this activity continued through May 2013 with at least one of the alleged prostitutes actually living at the Club Parkway premises. These facts provided a sufficient basis for Magistrate Judge Walker to issue the warrant.

First, the application showed, based on the interview of a third prostitute victim, MRM, that she was brought into the United States in 2010 by Defendant

Garcia-Tepal, that she was engaged in prostitution during that time period, and that during that time she was in telephonic contact with both Defendant Garcia-Tepal and Defendant Rojas-Coyotl numerous times.

Second, agents in March 2013 saw MRM and Defendant Garcia-Tepal leaving the Club Parkway premises, and insurance records linked MRM to the blue Toyota Celica that agents repeatedly saw throughout early 2013 at the Club Parkway premises.  Third, a CS reported that an individual picked up MRM/Roxanna for prostitution on at least one occasion, and another victim (Mariana/WITNESS-1) on at least three occasions, all from the Club Parkway premises, between November 2012 and February 2013.  Fourth, Defendants Garcia-Tepal and Rojas-Coyotl, who had been previously identified by prostitution victims as having smuggled them into the United States and/or forced them to commit prostitution, were directly linked to the Club Parkway premises by numerous visual surveillance sightings of themselves and their cars, and by the utility records in Rojas-Coyotl's name.

These facts supplied more than enough basis to reasonably conclude, in May 2013, that these Defendants were engaging or had recently engaged in sex trafficking and prostitution, and that evidence would fairly probably be found at the Club Parkway premises.  These facts suggested not just a discrete, one-time

crime.  Rather, the affidavit evoked a long term sex trafficking operation that

extended for several months if not years and that had been based in part in the Club

Parkway premises for six months or more.

Also, the activities of Defendants Rojas-Coyotl and Garcia-Tepal were

consistent with running a sex trafficking operation.  According to the affidavit, sex

traffickers typically maintain multiple residential premises, in part to keep

prostitutes separated, and in part to separate financial records and other evidence

from their own residences. [76-1] ¶¶ 41,42 .  Here, the surveillance showed that the

Defendants maintained and/or had access to several residential premises during this

period, and regularly traveled from one to the other.   Moreover, the affidavit

specifically stated that sex traffickers maintain financial and other business records

and other instrumentalities and evidence in residential premises "for an extended

period of time." *Id.* ¶ 11.E.

The Defendant argues that the agents saw no illegal acts themselves and

received no direct victim statements alleging sex trafficking since 2010.  But that

level of proof was not required to obtain the warrant.  Rather, the Court is

compelled to look at the facts set forth in the affidavit in their entirety.  Here, the

numerous victim statements establishing sex trafficking and alien smuggling in

2006-2008 and 2010, which, combined with the other evidence obtained in 2012

and 2013, including agent surveillance and confidential source information, suggested that the activity was continuing and that it involved the Club Parkway premises.

The Defendant criticizes the affidavit's reliance on a confidential source.  Of course, statements from confidential or anonymous sources must be considered with more care.  But they still may provide or contribute to a basis for finding probable cause if, in the totality of the circumstances, the information is sufficiently reliable.  In *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir.1996), the Eleventh Circuit carefully set out various factors for courts to consider in reviewing a confidential source's statements: corroboration of the details of the tip through independent police work; whether the informant has made a statement against his penal interests; whether the informant had personal knowledge; whether there is a past history between the informant and the police department that supports his reliability; and whether the police took independent steps to investigate the tip.

The question before the undersigned is simply whether Magistrate Judge Walker had a reasonable basis to rely on this CS's information.  The answer is yes. On the one hand, weighing against reliability, the affidavit does not explain the CS's basis of knowledge.  It is not clear whether the CS is speaking from first-

hand, personal knowledge or rather from second-hand information.  But while this does not assist the showing of probable cause, it is not the end of the story.[1]  Other factors weigh in favor of a finding of reliability, and Magistrate Judge Walker could have reasonably found it to contribute to a showing of probable cause.

First, the affidavit made clear that the agents had prior dealings with the CS and that the CS had provided reliable information in the past. Affidavit [76-1] ¶ 25 n.3. Second, the information was reasonably precise, in that the CS provided specific names for the victims, the number of times they were picked up for prostitution and (to the month) when those events occurred.  Third, critically, the information provided by the source was consistent with the other facts obtained in the investigation.  The source stated that MRM and WITNESS-1 were picked up at the Club Parkway premises.  That MRM and WITNESS-1 were staying at this location was independently corroborated by the agents' visual sightings of individuals believed to be MRM and WITNESS-1 at that location, as well as (in the case of MRM) insurance and phone records.  Moreover, these women were both linked through past statements and telephone records to Defendants Tepal-Garcia and Rojas-Coyotl, who the agents connected through surveillance and

---

[1] While explaining a CS's basis of knowledge is the best practice, and sometimes critical to showing reliability, the Court recognizes that in some cases explaining how a CS knows facts might tend to identify who he or she is.

insurance/utility records to the Club Parkway premises.  The source also stated that MRM and WITNESS-1 were picked up for prostitution.  That at least MRM was a prostitute was consistent with her own prior statements to agents back in 2010.  Thus, for all of these reasons, it would have been reasonable to find that the CS's information was sufficiently reliable.

In sum, considering the entire affidavit, the recency of the specific facts relating to the Club Parkway premises, the nature of the criminal activity, and the specific tendency of perpetrators of these crimes to create, maintain and conceal records of their activity for extended periods of time in residential premises, all combined to provide a reasonable basis for Magistrate Judge Walker to find probable cause.  At a minimum, the indicia of probable cause were sufficient for a reasonable agent to rely in good faith on the warrant.  Suppression must be denied.

### b.    The Forest Vale 3 and 5 Premises

The Defendant's motion does not separately discuss the specific probable cause showing relating to the Forest Vale 3 or 5 premises.  Rather, Defendant's argument appears to be a global one applicable to all three premises, that is, that the warrant application was stale because it presented no witness statements establishing sex trafficking since 2008.  The undersigned rejects that argument, as

explained above.  Based on the affidavit, as explained above, it was reasonable to find probable cause that the Defendant and others were involved in a sex trafficking operation in late 2012 and 2013.

Specifically with regard to Forest Vale 3 and 5, the affidavit showed that Defendant Rojas-Coyotl maintained or at least used those premises through late March 2013.  The utilities for Forest Vale 3 were in his name as of March 2013, and agents saw him and his white Lumina there on various occasions through April 2013.  In April 2013, they also saw Defendant Tepal-Garcia visit the premises at the same time that Defendant Rojas-Coyotl's car was parked there too, suggesting a possible meeting at the premises. Affidavit [76-1] at ¶ 31.

As for Forest Vale 5, the agents saw Defendant Rojas-Coyotl enter that apartment on various occasions during that period, including at least one time with a key, and phone records showed that he had contact with the phone number there 24 times into May 2013.[2]  All of this occurred within just 2-3 months of the

---

[2] The Government challenges the Defendant's standing to move to suppress the fruits of the search of Forest Vale 5, as to which, unlike the other premises at issue here, the utility and phone records were in a third party's name.  Whether a movant has a legitimate expectation of privacy in a particular premises is determined in the totality of the circumstances.  *See Rakas v. Illinois*, 439 U.S. 128, 130, n.1 (1978).  This can be established with proof that the movant owned or rented the premises or otherwise enjoyed "an unrestricted right of occupancy or custody and control of the premises . . . ."  *United States v. Bachner*, 706 F.2d 1121, 1126 n. 6 (11th Cir. 1983) (internal quotations omitted).  Here, the affidavit

issuance of the warrant.

To be sure, Agent Towns' affidavit does not identify any direct evidence, through surveillance, witness statements, or otherwise, to show that either Forest Vale apartment was used in the sex trafficking operation or how they were so used. Rather, the Government's theory is that the Defendant's use of separate residential premises at which he did not appear to reside, at the time he was actually engaged in sex trafficking, and at which (in the case of Forest Vale 3) he met with a Co-Defendant, provided probable cause that these premises were being used in the scheme. In this regard, Agent Towns specifically stated that, based on her training and experience, "traffickers often maintain multiple apartments where they keep different woman [sic] who work for them as prostitutes to prevent the women from learning about each other." [76-1] ¶ 41. Agent Towns also explained that "traffickers often maintain and conceal evidence, fruits, and instrumentalities of their crimes at locations other than their residences to prevent them from being

---

established that the Defendant was in close and frequent telephonic contact with someone at that location, visited the apartment on various occasions, and at least one time was seen letting himself in with a key. Indeed, Agent Towns' affidavit states that "Arturo Rojas-Coyotl currently uses and has control and access to an apartment located at [Forest Vale 5]." [76-1] ¶ 34. The Court finds that these facts are sufficient to establish Defendant's standing to contest the search. Whether the lease, phone account or utility accounts were in Defendant's name, the Government's own testimony that he "uses and has control and access" is sufficient.

discovered by law enforcement."  *Id.* ¶ 42.

Reading the record with deference to Judge Walker's decision, the undersigned finds that the warrant applications provided reasonable grounds to find probable cause as to the Forest Vale premises.  Having found probable cause that Defendants Rojas-Coyotl and Garcia-Tepal were involved in an extended sex trafficking operation directly involving the Club Parkway Premises, it follows that probable cause also existed for these other residential premises used or maintained by the Defendants during the same time period, which fit the pattern described in the specific testimony provided by Agent Towns.   At a minimum, even if probable cause could be questioned, the question was at least close enough that a reasonable agent could have relied in good faith on the warrant issued by Judge Walker.

### c.   Search Or Seizure Of The Chevy Lumina

The Defendant's motion also mentions and appears to request suppression of the 2001 Chevy Lumina, which the Government apparently seized.  Affidavit [76-1 at p. 12].[3]   Defendant makes no particular argument, however, relating to the

---

[3] The affidavit also sought authority to seize three other vehicles, but the Government represents that two (a 2000 Toyota Celica and a 2004 Ford Mustang) were not seized, *see* Gov't Br. [69] at 3 n. 1, and the Defendant concedes that he lacks standing to challenge the seizure of the remaining vehicle (a 2002 Chrysler Town and Country), *see* Def. Br. [76] at 3.

seizure of the Lumina.

The warrant applications provided reasonable grounds for Judge Walker to authorize seizure of the vehicle.  Title 8, U.S.C., 1324(b), states that any "vehicle... that has been or is being used in the commission of a violation of [§ 1324(a)] ... shall be seized and subject to forfeiture."  The affidavit here established a reasonable basis to find probable cause that the Lumina had been used in the commission of such a crime.  The agents linked that vehicle through insurance records to Defendant Rojas-Coyotl, and saw him on several occasions using that car to travel to and from the Club Parkway and Forest Vale premises.  *See* Affidavit [76- 1] ¶¶ 18, 20, 21, 30.  On at least one occasion Defendant was seen transporting an unidentified female and young child in the Lumina.  *Id.* ¶ 21.  As noted in detail above, the facts showed that the Defendant was involved in the operation of a alien harboring and prostitution operation involving the Club Parkway and Forest Vale premises.  These facts contributed to provide at least arguable probable cause to authorize seizure of the car.

## II.       MOTION TO SUPPRESS IDENTIFICATIONS

### A.    FACTS ADDUCED AT THE OCTOBER 8, 2013 EVIDENTIARY HEARING

#### 1.     *FBF's Knowledge and Identification of Defendant*

Special Agent Towns testified that she first interviewed the individual identified as FBF in December 2011.  Transcript of Hearing, October 8, 2013 [Doc. 108] ("Tr.") at 9-10.  All of the facts concerning the identifications by and statements of FBF and the other alleged victims were provided by agent testimony, as the prosecution declined to call the alleged victims themselves at the hearing.

During that interview, FBF informed Towns about Arturo Rojas, a/k/a Taco, later identified as Defendant Rojas-Coyotl, who FBF explained had brought her to the United States.  *Id.* at 9-10, 12, 35.  She described Defendant Rojas-Coyotl as being 26 or 27 years old, approximately 5'6" to 5'8" tall, thin, spiked black hair, clean-shaven, without glasses or tattoos, and that he is from the town of Tenancingo, in Tlaxcala state, Mexico.  *Id.* at 13-14.  FBF also identified the name of Defendant Rojas-Coyotl's father and the aliases of two of his uncles.  *Id.* at 15-16.

According to her statements to Towns, FBF became romantically involved

with Defendant Rojas-Coyotl after they met at a dance in Mexico City in February 2006. *Id.* at 14-15. They attempted to cross together into the United States, but Defendant Rojas-Coyotl was unsuccessful. *Id.* FBF proceeded to a residence in Norcross, Georgia, where Defendant's uncles lived with two other girls. *Id.* at 16. Defendant Rojas-Coyotl arrived shortly thereafter. *Id.* For over a year, until FBF escaped towards the end of 2007, Defendant and his uncles drove her to brothels around the southeast to engage in prostitution and Defendant Rojas-Coyotl helped collect the proceeds. *Id.* at 16-17 , 38.

Based on FBF's information, Towns found records of Defendant Rojas-Coyotl, who had been apprehended with FBF several times at the U.S.-Mexico border. *Id.* at 39. This information included Defendant Rojas-Coyotl's photograph. *Id.* at 39-40. The records indicated that Defendant Rojas-Coyotl's father is also named Arturo, which was the name FBF had provided for Defendant's father. *Id.*; Gov't Ex. 4-A. He also stated to the border officers during some of his encounters with them that he was from Tlaxala state, Mexico, as FBF had stated. Gov't Exs. 4-C; 4-E. However, he stated on other occasions that he was from the neighboring state of Puebla. Gov't Ex. 4A. Towns also found records showing that Defendant Rojas-Coyotl had previously been arrested in Gwinnett County, Georgia, and had provided an address in Norcross. Tr. at 40.

Towns then met with FBF to show her a series of five photographs, including one of Defendant Rojas-Coyotl and another of one of is uncles, Co-Defendant Odilon Martinez-Rojas.  Tr. at 18-19, 67-68; Gov't Exs. 3A-3E.  One of the other photographs was of a woman suspected of running an Atlanta-area brothel.  *Id.* at 21.  The agents did not show FBF all of the photographs together in a single array; rather, they showed her each photograph individually, one-by-one, starting with Defendant Rojas-Coyotl's photograph first (Gov't Ex. 3A), and then proceeding to the Co-Defendant's photograph next.  *Id.* at 19-22.  The agents asked FBF to simply indicate whether she truthfully recognized each person.  *Id.*  Towns testified that they did not suggest who may have been in any of the photographs. *Id.*  FBF immediately identified the Defendant's photograph as the individual she had described as Arturo Rojas, a/k/a Taco.  *Id.* at 20, 23, 69.  She also immediately identified Co-Defendant Martinez-Rojas's photograph as Rojas's uncle whom she knew as "Chino."  *Id.* at 16, 20, 70.  FBF also identified the female in the third photograph, and failed to identify the individuals in the remaining photographs.  *Id.* at 21-22.

Subsequently, Towns's investigation discovered further evidence of FBF's interactions with Defendant Rojas-Coyotl, specifically including wire transfers of funds from each of them, using the same Norcross address, to the same individuals

in Mexico.  Gov't Ex. 5.

2.      *SAM's Identification of Defendant*

SAM was encountered in 2012 in Alabama by another agent.  Tr. at 23, 50.
SAM also provided information about Arturo Rojas, a/k/a Taco and Johnathan.  *Id.*
Described Rojas as approximately 20 years old, 5'9" in height, thin, with dark
brown eyes and black hair.  *Id.* at 23.  She also stated that Rojas had an uncle who
went by "Chino."  *Id.* at 29.  SAM explained that she and her friend, MSJ, began
communicating with Rojas and Chino while they (the two girls) lived in
Guatemala.  *Id.* at 29-30.  Rojas and Chino at the time lived in the Atlanta area.  *Id.*
In November 2007, SAM and MSJ illegally crossed the U.S. Mexico border in
Texas and met Chino and Rojas in Texas.  *Id.* at 30-31, 51.  They all then traveled
to and lived together in an apartment in Norcross, Georgia.  *Id*. at 30-31.  Chino
and Rojas transported SAM to brothels in the southeast for prostitution until she
escaped several months later in early 2008.  *Id.* at 30, 51-52.

Towns provided an employee of the FBI photograph laboratory photographs
of six subjects of the investigation, including Defendant Rojas-Coyotl and Co-
Defendant Martinez-Rojas.  *Id.* at 24.  This employee selected a group of 10-12
other substantially similar photographs of other subjects for each one of the six

subjects, focus on ethnicity, age, hairstyle, and other features, and then narrowed

each of those groups down to ultimately create six different photo arrays.  *Id.* at 24-

26.  Each of those arrays contained the photograph of one of the six subjects and

those of five other individuals selected from FBI files.  *Id.* at 24-26.  Towns and

another agent then met with SAM to show her the arrays.  *Id.* at 24.[4]

The agents told SAM that the arrays may or may not include any particular

individuals under investigation.  *Id.* at 24.  The fourth array presented to SAM

included Defendant Rojas-Coyotl's photograph–the same photograph that was

shown to FBF–in the third position.  *Id.* at 26-28; Gov't Ex. 1A.  Sam immediately

identified the person in that photograph as the individual she knew as "Taco."  *Id.*

at 29.  The sixth array contained Defendant Martinez-Rojas's photograph, in the

fifth position.  *Id.* at 27.  SAM immediately identified that individual as "Chino."

*Id.* at 29.

### 3.   *Identification by MSJ*

MSJ was also interviewed by Towns.  Tr. at 32, 60.  MSJ also stated that she

knew the Defendant, who she knew as Jonathan Arturo Rojas, and Chino.  Tr. at

---

[4] The exact date of this interview is unclear to the Court.  Agent Towns
testified that it occurred on August 24, 2012, Tr. at 24, but the identifications
signed by SAM were dated October 24, 2012, *see* Gov't Ex. 1A.

33.  She confirmed that she had traveled into the U.S. illegally with SAM, lived in

Norcross with SAM, Chino and the Defendant, and the Defendant arranged for her

to engage in prostitution.  *Id.* at 33-34, 61.  On April 24, 2013, at least six months

after SAM identified the Defendant, Towns showed MSJ the same six photo

arrays.  *Id.* at 32-33; Gov't Ex. 2A.  Towns asked MSJ if she recognized any

individuals and MSJ identified the Defendant's photograph as Jonathan Arturo

Rojas and Co-Defendant Martinez-Rojas's photograph as "Chino."  *Id.* at 33.

## B.    ANALYSIS

### 1.    *Legal Standards Governing Motions To Suppress Identifications*

The Supreme Court has developed a two-step test for determining whether

an out-of-court identification based on a lineup or photo array is so unreliable as to

violate due process. *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977).  "The primary

evil to be avoided is the substantial likelihood of irreparable mistaken

identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). First, the

Defendant bears the burden to show that the out-of-court photo identification

procedures used were unduly suggestive. *Williams v. Weldon*, 826 F.2d 1018, 1021

(11th Cir. 1987). If the court finds that the procedures are unduly suggestive, it

must then determine whether the identification, given the totality of the

circumstances, creates a substantial risk of misidentification. *Id.; Neil v. Biggers*, 409 U.S. 188, 196 (1973)(*citing Simmons*, 390 U.S. at 384).  The burden rests with the Government as to the second step.  *United States v. Wade*, 388 U.S. 218, 240 (1967).  If both steps end with an answer in the affirmative, the court must set aside the out-of-court identification. *Biggers*, 409 U.S. at 197.

A subsequent in-court identification will only be suppressed if, after considering the *Biggers* factors, there is a "very substantial likelihood of irreparable misidentification." See *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (explaining that short of a "very substantial likelihood of irreparable misidentification .... such evidence is for the jury to weigh").  Here, Defendant has made different statements about what he is seeking to suppress.  In his initial post-hearing brief, he stated that he was moving to suppress any testimony concerning any of the alleged victims' out-of-court identifications, as well as any in-court identification that may be offered by MSJ.  *See* Def. Post-Hearing Br. [112] at 14. In other words, Defendant appeared to not request suppression of any in-court testimony by FBF or SAM.  However, in his reply brief, Defendant framed his request much more broadly, that is, that he was moving to suppress "all out-of-court and in-court identifications by government witnesses."  Def. Reply [117] at 9.  In the interests of caution, the Court considers the broadest relief requested by

the Defendant.

### 2.   *FBF's Identification*

#### a.   Suggestiveness

The first and most difficult issue before the Court is whether it was unduly suggestive for the FBI to display photographs to FBF one at a time, rather than all together in an array.  The Eleventh Circuit has made abundantly clear that "a single photograph display is one of the most suggestive methods of identification and is always to be viewed with suspicion."  *See Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979); *United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir.1980) (procedure unduly suggestive where witness was shown one photograph of the defendant)[5].  And, although the Government argues that a single photograph identification is not *per se* unduly suggestive, the Government cites no Eleventh Circuit case finding such an identification not to be.  More typically, the Eleventh Circuit finds or assumes the use of a single photograph to be unduly suggestive, and proceeds to analyze the case under the reliability prong of the *Manson* test. *See United States v. Walls*, 237 Fed.Appx. 599, 601 (11th Cir. 2007) (unpublished)

---

[5] *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (C.A.11 1981) (*en banc*) (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the Eleventh Circuit)

(assuming, without deciding, that use of singe photograph was unduly suggestive, but nevertheless denying suppression because the evidence demonstrated that the identification was reliable).

This case, however, is not the same as those involving a single photograph. Here, the FBI had five photographs to show FBF.  Agent Towns made it clear to FBF that she was not just going to be shown just one photograph.  *See* Tr. at 19 ("[I] just told her that we had some photographs we wanted to show her to see if she knew anyone in the photographs . . . .")  And Agent Towns explained that no suggestion was made to FBF as to whose photographs were being shown.

The one-at-a-time display of the photographs was unnecessary here and it would have been better to display the photographs all in a single array.  But, unlike single photograph identifications, the courts have generally not found the display of multiple photographs one-by-one to be unduly suggestive in and of itself.  *See, e.g., United States v. Shoels*, 685 F.2d 379, 385 (10th Cir. 1982) (affirming finding that "the photographic procedure was fair and not suggestive" where "[t]he investigators presented the photographs one at a time to each witness separately and without comment."); *United States v. Antoine*, No. 10-229, 2012 WL 3765173, *9 (W.D. Pa., August 30, 2012) (distinguishing a particular identification involving only a single photograph, which was found to be unduly suggestive, with

a prior identification in which the officer showed a witness "a number of photographs, one at a time, and asked him whether he knew any of the individuals in the photograph," which was found to be permissible); *United States v. Simmons*, No. 07-CR-30, 2007 WL 2752390, *5 (E.D. Wis. September 20, 2007) (procedure not suggestive where officer "testified that he showed the witnesses [multiple] photos one at a time.")

This distinction is a close one. But there is reason to distinguish between a single photograph identification and a one-at-a-time display of multiple photographs. Where a witness is aware that multiple photographs will be displayed, there is less significance to the display of any particular photograph. By contrast, the display of single photograph almost necessarily imparts the message that the police believe the subject of the photograph is related to the case. Here, although Towns displayed Defendant's photograph first, she also made clear before showing any photographs that she would be showing several to FBF. Towns's instructions were also non-leading. Instead of asking "is this Taco," she simply asked FBF to say if "she knew anyone in the photographs." *See* Tr. at 19. Thus, while it would have been better to display an array and/or to have not displayed Defendant's photograph first, the Court finds that Defendant has not met his burden to show an unduly suggestive procedure.

b.    Reliability

While the question of suggestiveness is a close call, the ultimate and more important question of reliability is not.  The evidence strongly supports the reliability of FBF's identification.

As noted above, even unduly suggestive procedures do not require suppression if the Government can show based on the totality of facts that the identification was nonetheless reliable.  *See Manson*, 432 U.S. at 109–114.  In making this determination, the Court is to consider the five factors set by the Supreme Court in *Biggers*: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200.

Defendant focuses on the fifth factor, because over four years had elapsed from the time FBF last saw the Defendant to when she identified his photograph.  But that passage of time is more than counterbalanced by the strength of the other factors.  Critically, this is not the case of a fleeting bystander identification.  The Government adduced facts showing that FBF knew the Defendant for nearly two

years, had a romantic relationship with him, crossed or attempted to cross the

border with him on more than one occasion, shared an address with him and his

family members in Norcross, and was transported to engage in prostitution by the

Defendant.  Tr. at 14-17, 38.  Plainly, this extended relationship provided a strong

opportunity for FBF to recognize the Defendant.  *See, e.g. United States v. Burgos*,

55 F.3d 933, 942 (4th Cir. 1995) (the likelihood of misidentification is

substantially less when a witness is asked to identify someone with whom he is

acquainted, rather than a stranger); *United States v. Castro*, 243 F.Supp 2d 565,

570–571 (W.D.Va.2003) (single-photograph identification reliable where witness

was identifying a business associate).

FBF also provided a detailed physical description of the Defendant before

being shown his photograph.  And FBF demonstrated how well she knew the

Defendant by identifying his approximate age, what town in Mexico he is from,

and names and/or aliases of family members including the Defendant's father.  *See*

Tr. at 13-16.  While the Government did not establish whether FBF expressly

described the certainty of her identification, Towns testified that the identification

of Defendant was "immediate[]."  *Id.* at 20, 23, 69.  In light of these facts, the mere

lapse in contact between FBF and the Defendant does not suggest such

unreliability as to warrant suppression.

C.     *SAM's/MSJ's Identifications*

SAM and MSJ were both shown a six photograph array prepared by an FBI photograph specialist.  Gov't Exs. 1A; 2A.  Defendant nevertheless argues that the arrays were unduly suggestive "because the defendant's photo was 'markedly different in physical appearance' from other photos."  Def. Br. at 6 (citing *Jones v. Newsome*, 846 F.2d 62, 63 (11th Cir. 1988) (showing defendant's photograph in two separate arrays, coupled with marked physical differences with the other photographs, was unduly suggestive)).

The Court finds that Defendant fails to meet his burden to demonstrate suggestiveness.  Defendant argues that he was only one of two people that appear to be of Latino descent, and also that his photograph appeared different in coloring and quality.  Neither argument is availing.  All six males depicted in the array are of similar age, hair length, and general facial features.  Most have similar hair styles and color.  And while the tints of the skin colors range somewhat, several of the individuals depicted have close skin color and most appear to at least within a comparable range.  Indeed, there is only one individual that clearly appears to be of a different race than Defendant  (no. 5 on Gov't Ex. 1A), and even he is roughly similar in age, hair and facial features.  Certainly, the Court is not in a position to speculate that only one other individual is Latino.  The selection of photographs is

therefore not unduly suggestive.  *See Williams v. Weldon*, 826 F.2d 1018 (11th Cir.

1987) (an array in which the defendant was the only African-American was not

unduly suggestive, where the defendant was relatively light-skinned, and the other

individuals depicted were of Latino descent); *United States v. Ricks*, 817 F.2d 692

(11th Cir. 1987) (an array in which the defendant was the only individual depicted

with eyeglasses was not unduly suggestive).

     As for the coloring, there is nothing so dramatic and distinctive as to render

this array unduly suggestive.  Indeed, several of the photographs show unique

coloring, lighting or shading differences.  While the Defendant's photo (No. 3 on

Gov't Ex. 1A) has a slight gray tint on the forehead and on one side of the nose,

photo No. 1 has a unique shading on half the face, photo No. 2 appears to have a

faint line going down the middle of the face with a coloring difference on either

side, and photo No. 4 has a unique blue-ish tinge around the hair.  Photo No. 6 is

also slightly different, in part because the individual appears to be the only one

smiling, and No. 1 is the only one appearing to have a hint of stubble.  These are

nothing more than natural minor variations in photographs and they fall far short of

rendering the array unduly suggestive.  *Cf. O'Brien v. Wainwright*, 738 F.3d 1139

(11th Cir. 1984) (showing an array with all black and white photos, except for the

defendant's photograph, which was in color, was unduly suggestive).

Moreover, as with FBF, even if there were some suggestiveness, the facts confirm at least a threshold level of reliability. Like FBF, SAM and MSJ both lived with Defendant in Norcross for several months in late 2007 and early 2008. Tr. at 30-34, 51, 61. They both traveled with the Defendant from Texas to Georgia. *Id.* The Defendant actively prostituted both witnesses. *Id.* Both witnesses immediately identified the Defendant. Tr. at 29, 33. The Defendant had a sexual relationship with at least MSJ. Tr. at 34. SAM also provided a pre-identification description of the Defendant, including his approximate age, height, build, eye and hair color, as well as the identity of one of his uncles.

Defendant again focuses on the passage of time since when these witnesses escaped the Defendant's custody (2008) and when they identified him in photographs (2012 in SAM's case; 2013 in MSJ's case). Again, however, while this passage of time may be considered by the jury, the fact that these witnesses knew the Defendant well, lived closely with him, in one case had a sexual relationship with him, and were trafficked for sex by him more than establishes a foundational level of reliability.

Defendant argues that the record as to MSJ is particularly inadequate to show reliability. First, Defendant points out that MSJ apparently provided no physical description of the Defendant. Second, Defendant argues, the agents never

specifically admonished MSJ that the array might not include any suspects at all. Third, the two witnesses were in contact after SAM's interview, and Defendant suggests SAM may have influenced MSJ. Specifically, Defendant argues that the Government has not disproved the possibility that SAM may have improperly tipped MSJ off as to the upcoming identification.

These factors are relevant to the analysis and may be considered by a jury. But the Court nevertheless finds that the depth and extent of MSJ's interactions with Defendant–living with him for months, being "pimped" by him, and having a sexual relationship with him herself–is the determinative factor in establishing the requisite level of reliability. As for the notion that SAM coached MSJ, the Defendant does not point to anything concrete in the record to support such speculation. Moreover, the FBI interviewed MSJ at least six months after interviewing SAM. It is questionable at best that SAM, who was shown several different arrays during her interview totaling dozens of individual photographs, would have recalled the specific location of the Defendant's photograph on the fourth array shown to her so many months earlier, and that she would have coached MSJ specifically about that particular fact. In any event, in light of all of the evidence establishing reliability, the mere fact that this coaching was possible does not warrant suppression.

* * * *

Thus, the record shows that the identifications procedures with regard to all three of these witnesses were not unduly suggestive, and also that the totality of circumstances warrants a finding of sufficient reliability.  Certainly, this is far from a case that involves a "very substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 116.  All other issues identified by Defendant are capable of being assessed by the jury.

## III.   MISCELLANEOUS MOTIONS RELATING TO DEFENDANT ROJAS-COYOTL

Defendant initially filed a Motion Seeking Identification Of The Confidential Source [61].  As noted above, the Confidential Source provided information that contributed to the search warrant application relating to the harboring and prostitution of MRM/"Roxanna".  The CS provided no information relating to the harboring and prostitution of SAM, MSJ or FBF.

After Defendant filed this Motion [61], the Government filed a Motion to Dismiss Count Seven as to Defendant Rojas-Coyotl. [101].  Count Seven is the only count that arises from the alleged victimization of MRM.  Thus, Defendant, has now filed a Motion to Withdraw [106] his earlier Motion Seeking Identification of the Confidential Source [61].  Defendant recognizes that his need

for the CS's identity is moot in light of the anticipated dismissal of Count Seven, but he reserves a right to renew the motion if the Government unexpectedly seeks to introduce evidence relating to MRM against him on some other theory.  *Id.*

The undersigned first **RECOMMENDS** that the Government's unopposed Motion to Dismiss Count Seven as to Defendant Rojas-Coyotl be **GRANTED**.  In light of the anticipated dismissal of this Count as to the Defendant, the Court also **ORDERS** that Defendant's Motion to Withdraw [106] be **GRANTED** and that his earlier Motion Seeking Identification [61] be deemed **WITHDRAWN**.

## CONCLUSION

Thus, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence [59] and Motion to Suppress Identifications [90] be **DENIED**. The Court further **RECOMMENDS** that the Government's Motion to Dismiss Count Seven [101] as to Defendant Rojas-Coyotl, which is unopposed, be **GRANTED**.

The Court **ORDERS** that Defendant's Motion to Withdraw [106] be **GRANTED** and thus **DIRECTS** the Clerk to deem Defendant's Motion Seeking Identification of Confidential Source [61] to be **WITHDRAWN**.

**IT IS SO RECOMMENDED** this 7th day of February, 2014.


_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE